UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| CURTIS L. DALE, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) 1:02-cv-143-SEB-VSS |
| P.O. POSTON, et al., | ) ) ) |
| Defendants. | ) ) |

**Entry Discussing Motion for Summary Judgment**

This cause is before the court on the amended complaint of plaintiff Curtis L. Dale, on the defendants' answer, and on the defendants' motion for summary judgment.

Whereupon the court, having considered the pleadings, the motion for summary judgment, the response thereto and the defendants' reply, and being duly advised, now finds that the motion for summary judgment must be **granted.** This conclusion rests on the following facts and circumstances:

1. As used in this Entry, "Dale" refers to the plaintiff, Curtis Dale, "USPTH" refers to the United States Penitentiary at Terre Haute, Indiana, "BOP" refers to the Federal Bureau of Prisons, and "SHU" refers to the Special Housing Unit of the USPTH. Dale alleges that the defendants violated his Eighth Amendment right to be free from cruel and unusual punishment when they failed to protect him from an attack by a fellow inmate.

2. As noted, the defendants seek resolution of Dale's claim through the entry of summary judgment.

   a. The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Note to 1963 Amendment of **FED.R.CIV.P.** 56(e) (quoted in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" In a motion for summary judgment, the court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003) (citations omitted). "Rather, '[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.'" *Id.* (quoting *Waldridge v. Am.*

*Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994)). If a reasonable jury could return a verdict in favor the nonmovant, summary judgment should not be granted. *Id.* (citation omitted).

b.   A court will grant summary judgment if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Scott v. Edinburg,* 346 F.3d 752, 755 (7th Cir. 2003) (quoting **FED.R.CIV.P.** 56(c) and citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)). The court must "construe all facts in a light most favorable to . . . the party opposing summary judgment, and . . . draw all reasonable inferences in his favor." *McGreal v. Ostrov,* 368 F.3d 657, 672 (7th Cir. 2004) (citation omitted). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook,* 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith v. Severn,* 129 F.3d 419, 425 (7th Cir. 1997)). However, the nonmoving party bears the burden of coming forward with specific facts from the record which show a genuine issue of material fact. *Morfin v. City of E. Chi.,* 349 F.3d 989, 997 (7th Cir. 2003) (citation omitted). "It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Liberles v. County of Cook,* 709 F.3d 1122, 1126 (7th Cir. 1983).

c.   While the summary judgment standard of review requires the court to examine the facts in a light most favorable to the nonmoving parties, this court's Local Rule 56.1 also requires the nonmoving parties to provide, in a response brief, a section labeled "Statement of Material Facts in Dispute" that "responds to the movant's asserted material facts by identifying the potentially determinative facts and factual disputes which the nonmoving party contends demonstrate that there is a dispute of fact." Local Rule 56.1(b). To the extent that the nonmoving parties fail "specifically" to controvert facts alleged and supported by the moving party, those facts are to be assumed true. Local Rule 56.1(e). This is a requirement fully warranting enforcement, even when the nonmovant is proceeding without counsel. *See, e.g., Greer v. Bd. of Educ., of the City of Chicago,* 267 F.3d 723, 727 (7th Cir. 2001); *Members v. Paige,* 140 F.3d 699, 702 (7th Cir. 1998) (stating that procedural rules "apply to uncounseled litigants and must be enforced"). The Seventh Circuit has "consistently and repeatedly upheld" district courts' discretion to require compliance with the local rules governing summary judgment. *Bordelon v. Chicago Sch. Reform Bd. of Trustees,* 233 F.3d 524, 527 (7th Cir. 2000); *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 922 (7th Cir. 1994) (collecting numerous cases).

d.   Here, Dale has opposed the motion for summary judgment with both a discussion of his claim and with a sworn statement. The sworn statement, however, is argumentative and lacks detail. "[A] party's failure to comply with summary judgment evidentiary requirements is traditionally remedied . . . by excluding the non-conforming submission and deeming the opposing party's proposed findings of fact admitted and then determining whether those facts entitle the moving party to

judgment as a matter of law." *Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003) (citing cases). There is no reason to stray from the traditional remedy in this case. "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *DeNovellis v. Shalala,* 124 F.3d 298, 305-06 (1st Cir. 1997)(quoting *Fed. R. Civ. P.* 56(e) advisory committee's note to 1963 amendment). Even if conclusory statements to this effect had been placed in an affidavit, Dale could not thereby avoid summary judgment, for "[t]he object of [Rule 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888 (1990). Accordingly, the court has set forth as true those factual allegations which the defendants properly asserted and supported in its brief that were not specifically disputed by Dale in the manner required by the applicable rules.

3. "Relief from misconduct by federal agents may be obtained either by a suit against the agent for a constitutional tort under the theory set forth in *Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971), or by a suit against the United States under the Federal Tort Claims Act [FTCA] . . . which permits claims based upon misconduct which is tortious under state law. 28 U.S.C. §§ 1346(6), 2680." *Sisk v. United States,* 756 F.2d 497, 500 n.4 (7th Cir. 1985). Dale has chosen the *Bivens* route.

   a. Claims asserted under a *Bivens* theory are brought pursuant to subject matter jurisdiction conferred by 28 U.S.C. § 1331, which provides that "[t]he District Courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

   b. A prerequisite to maintaining an action under §1331 is that the plaintiff "must allege a violation of the United States Constitution or a federal statute." *Goulding v. Feinglass,* 811 F.2d 1099, 1102 (7th Cir. 1987), *cert. denied*, 107 S. Ct. 3215 (1987).

   c. *Bivens* "authorizes the filing of constitutional tort suits against federal officers in much the same way that 42 U.S.C. § 1983 authorizes such suits against state officers." *King v. Federal Bureau of Prisons,* 415 F.3d 634, 636 (7th Cir. 2005). Thus, one feature of a *Bivens* action is that the plaintiff must allege that the individual defendants were personally involved in the violation of his constitutional rights. *See Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir. 1987), *cert. denied sub nom. Barbera v. Schlessinger,* 489 U.S. 1065 (1989).

4. Just as "the first step in any [§ 1983] claim is to identify the specific constitutional right infringed," *Albright v. Oliver,* 510 U.S. 266, 271 (1994), the first question here is to determine the federal right implicated by Dale's claim that the defendants failed to protect him. The Eighth Amendment's proscription against the imposition of cruel and unusual punishment provides the constitutional standard for the treatment of convicted offenders such as Dale. *Helling v. McKinney*, 113 S. Ct. 2475, 2480 (1993). That is the pertinent constitutional provision associated with the claim in this action.

5.  The Eighth Amendment's proscription against cruel and unusual punishment protects prisoners from the "unnecessary and wanton infliction of pain" by the state. *Hudson v. McMillian,* 503 U.S. 1, 5 (1992) (citation and internal quotations omitted).

   a.  Thus the Eighth Amendment imposes on prison officials the duty "to protect prisoners from violence at the hands of other prisoners." Id. at 833.

   b.  In the specific context of Dale's claim in this case, the Eighth Amendment standard regarding the underlying claim in this action is this: The Eighth Amendment is violated by a prison official's deliberate indifference to "a substantial risk of serious harm to an inmate." *Farmer,* 511 U.S. at 828. Deliberate indifference is comparable to criminal recklessness, and is shown by "something approaching a total unconcern for [the plaintiff's] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." *Duane v. Lane,* 959 F.2d 673, 677 (7th Cir. 1992). The defendant "must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference." *Farmer,* 511 U.S. at 837; *see also Armstrong v. Squadrito,* 152 F.3d 564, 577 (7th Cir. 1998) ("the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so"). Knowledge of a risk can be shown if an official was exposed to information from which the inference could be drawn that a substantial risk exists, and he or she also draws the inference. *Proffitt v. Ridgway,* 279 F.3d 503, 506 (7th Cir. 2002); *Mayoral v. Sheahan,* 245 F.3d 934, 938-39 (7th Cir. 2001). This total disregard for a prisoner's safety is the "functional equivalent of wanting harm to come to the prisoner." *McGill v. Duckworth,* 944 F.2d 344, 347 (7th Cir. 1991).

   c.  As an overlay to the foregoing, moreover, the Supreme Court has stated that reasonable measures taken to avert known risks will insulate a prison official from Eighth Amendment liability, even if those measures proved unsuccessful. *See Farmer*, 511 U.S. at 845 ("[W]hether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause."); *see also Lewis v. Richards,* 107 F.3d 549, 556 (7th Cir. 1997) (Flaum, J., concurring).

6.  The defendants in this action are each employed by the BOP at the USPTH. The defendants and their positions are the following –

   Pamela Poston - Case Manager              Eric White - Correctional Counselor
   Lynne Fortune - Intake Screening Officer   Phyllis King -Intake Screening Officer

Each defendant is sued in his or her individual capacity, because that is the only fashion in which a *Bivens* claim proceeds. *Bunn v. Conley*, 309 F.3d 1002 (7th Cir. 2002).

7.  On the basis of the pleadings and the expanded record, and specifically on the portions of that record that comply with the requirements of Rule 56(e), the following facts are undisputed for purposes of the motion for summary judgment.

4

a. Insofar as pertinent to his claim in this case, Dale arrived at the USPTH on October 21, 1999. Because he was re-entering the prison after an absence, BOP policy required that he be placed (housed) in the SHU, pending a review of his return circumstances. This occurred, followed by a designation to the "E" general population Unit. Dale did not report a problem with other inmates to anyone.

b. On January 19, 2000, Dale again left the USPTH. He returned on April 19, 2000, and from that date through May 10, 2000, Dale remained in the SHU while his review was conducted and until bed space became available for him in general population. When he returned on April 19, 2000, he was interviewed by defendant Fortune. During the interview, Dale stated that he had a problem during his past stay at the USPTH with an inmate housed in Unit E, and that he generally had problems with inmates from the Muslim community. The inmate with whom Dale stated he had problems was not Parish Barnes, who later assaulted Dale, but another inmate named Sean Lewis and other members of Lewis' gang. This was the only concern that Dale noted to Fortune. Dale did not specifically identify any inmate by name, registration number, or description as having threatened him or as posing a risk to his safety, and he also did not request protective custody or indicate that he needed to be separated from anyone housed in general population, though he did state that he wanted a transfer out of the USPTH. Fortune noted the problems that Dale had mentioned on his intake form, marked "SHU" on the lower right corner of the Intake Screening form, and submitted the completed form to other staff. After completing Dale's inmate screening on April 19, 2000, Fortune had no further contact with him. Also after this particular screening session on April 19, 2000, Dale was assigned to the SHU.

c. On April 25, 2000, defendant Poston, who was a case manager at the USPTH at the time, interviewed Dale. During the interview, Poston discussed with Dale the issues he had raised during his intake screening. Dale asked for a transfer out of USPTH, as he had on other occasions. Dale asked to be re-designated to a lower level security facility and transferred to the Federal Correctional Institution at Pekin, Illinois. Poston explained to Dale that only the Regional Office could change his security designation and approve a transfer. She also asked Dale for more specific information about who "they" were, what kind of pressure he was getting, and whether he was in need of protective custody. Dale did not provide Poston with any specific information regarding a threat, nor did he identify a specific threat or risk that Dale ever identified any inmate as having labeled him a "snitch," and Poston had no information that any inmate or employee at the USPTH had identified Dale as a witness cooperating with the government. From April 19, 2000, through May 10, 2000, each time he mentioned "pressure" or "inmates asking questions," Poston would inform him that if he was in fear of his personal safety, or in danger of an assault or attack, that she could begin a protective custody investigation. On each occasion, Dale refused protective custody stating, "it's OK" or "I don't want to go out like that." Eric White's visits with Dale during this time period involved conversations of much the same nature as those Poston had with Dale vis-a-vis Dale's concerns with his safety, staff's desire for more specific information, Dale's option of requesting protective custody, and Dale's focused interest on being transferred to a specific BOP institution in Illinois.

5

      d.      Dale was away from the USPTH between May 10, 2000, and August 9, 2000. When he returned, he was placed in the SHU and a screening interview was conducted by defendant Phyllis King. During this interview, Dale did not advise Ms. King that he had any problems with inmates in Unit "E" or the Muslims. During the interview, Dale mentioned that he would go into general population if Ms. King "made him." No inmate is ever forced to enter general population and an inmate may always "lock up" or request protective custody in the SHU if he asserts that his safety is at risk. Dale did not identify any inmate by name or description as being someone who had threatened him or posed a risk to his safety, but did mention that he wanted a transfer out of USPTH because he did not believe he could live in general population. Dale never mentioned to Ms. King that his life was in danger or that he needed protection from anyone housed at USPTH. Because Dale was returning to his designated institution from a Writ, Dale again returned to the SHU, pending a Team review of his return circumstances. King therefore marked "SHU" on the lower right corner of the intake screening form and submitted the completed form to the appropriate intake staff. All of the actions Ms. King took when processing Dale complied with BOP policy. Ms. King specifically noted the problems that Dale mentioned in the intake interview on his form. After completing Dale's intake screening form, Ms. King had no further contact with Dale and was not personally involved in any decisions related to his ultimate housing or placement into the general population at USPTH.

      e.      Dale was released from the SHU and moved to "E" Unit on August 15, 2000. This location movement within the USPTH was authorized by the USPTH Segregation Committee, also known as the Special Housing Committee. Shawn Sykes was Dale's Unit Manager during the time that Dale was in the "E" Unit, which is an area within the prison's general population. When ordered to go to general population, Dale went voluntarily and did not refuse based on any fear for his safety. In Sykes' judgment there was no verifiable information that justified a re-designation or a reduction in security level for Dale. Rather, in his own judgment, Sykes believed that Dale was appropriately housed. Further, Sykes could not identify any specific or verifiable information that indicated that Dale could not safely live in general population, or that another inmate was a threat to Dale's safety.

      f.      Poston and White again had contact with Dale on the "E" Unit. Both Poston and White had offices in the "E" Unit and Dale had the opportunity for frequent or at least readily accessible conduct with these defendants while he was in that Unit. His conversations with them, however, did not stray from those he had with them during the period he was in the SHU. Specifically, during this time Dale did not identify any specific person who was threatening him and he did not request protective custody. Dale undertook his own contact with the group with which he apparently felt uncomfortable during this time and seemed satisfied with those measures.

      g.      While assigned to the "E" Unit, Dale worked the day shift in the food services department at the USPTH. So too did inmate Parish Barnes, who was also housed in the "E" Unit. Although Dale had no problems with Barnes during their food service shift, Dale believed that Barnes was telling other inmates in the Muslim community that Dale "done been to court several times and . . . shouldn't be allowed to stay."

6

Barnes also made a comment to Dale in the cafeteria about his testifying, and Dale would sometimes see Barnes sitting outside of his cell door.

h. On September 22, 2000, Dale and Barnes worked the morning food service shift together without incident, then Dale returned to his unit. Later that afternoon, Dale went to the recreation yard to exercise. Prior to going out to the Recreation Yard, Dale had no personal knowledge that Barnes was going to assault him. While he was exercising and talking to another inmate, Barnes approached Dale and referred to Dale as a "hot MF." Barnes then told Dale that he would see him "in the unit," and Dale said the same to Barnes, then returned to his work out. Soon thereafter, Barnes approached Dale again and said, "let me talk to you." Dale believed that Barnes legitimately wanted to talk, so he walked with Barnes to the other side of the recreation yard. Barnes then stabbed Dale several times with a knife.

8. The role of the intake screening officers--defendants Lynne Fortune and Phyllis King--in the foregoing was exceedingly limited. These defendants interviewed Dale upon his return to the USPTH. They did so pursuant to an established procedure and did so fully noting the information Dale provided regarding concerns he or the prison staff might have about his safety. In each instance, meaning on both April 19, 2000, and on August 9, 2000, Dale did not specifically identify any inmate by name, registration number, or description as having threatened him or as posing a risk to his safety, and he also did not request protective custody or indicate that he needed to be separated from anyone housed in general population. In each case, Dale was processed into the SHU, as was the policy of the BOP, and neither defendant Fortune nor King had a further role in determining Dale's housing or safety needs. The undisputed evidentiary record shows that neither of these defendants were "both aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," and that they "dr[e]w the inference." *Farmer,* 511 U.S. at 837. Defendants Fortune and King, therefore, are entitled to summary judgment in this case because they were not deliberately indifferent to "a substantial risk of serious harm to [Dale]." *Id.* at 828.

9. Defendants White and Poston had considerably more contact with Dale in the weeks before the assault than did Fortune and King, but even as to White and Poston there is no case to be made under the Eighth Amendment. The court reaches this conclusion because of the nature of the information Dale provided to these defendants and the nature of their responses. As to each of these defendants, Dale made allusions to his concerns for his safety, but was never specific. He could have been, but he opted to deal with those concerns in his own fashion. As it turns out, he dealt with the threat he knew, but was unprepared for the threat he did not expect, even as late as the afternoon of the day of the actual attack. White and Poston consistently sought more information from Dale about Dale's concerns. Dale was not forthcoming. This lack of information (though Dale was not the only conceivable source of that information) neither alerted these defendants to an identifiable threat to Dale's safety nor showed "the existence of so substantial a risk of harm that 'the defendants' knowledge of risk can be inferred.'" *James v. Milwaukee County,* 956 F.2d 696, 700 (7th Cir. 1992). What is equally pivotal in this case, moreover, is that White and Poston consistently made Dale aware that he could seek protective custody and that Dale never requested that status. White and Poston acted reasonably throughout Dale's

confinement in the SHU and thereafter during his assignment to the "E" Unit to make Dale's options available to him. Dale chose the option which turned out to be significantly dangerous to him, though even he did not anticipate being attacked by Parish Barnes on September 22, 2000, but this was not the result of the failure to White or Poston to follow the dictates of the Eighth Amendment. *McGill v. Duckworth,* 944 F.2d 344, 345, 348 (7th Cir. 1991) ("Prisons are dangerous places"; "some level of brutality . . . among prisoners is inevitable no matter what guards do"). White and Poston are therefore entitled to summary judgment.

10.   The defendants also seek resolution of Dale's claim on the basis of qualified immunity. The threshold question in a qualified immunity defense is whether, given the facts taken in the light most favorable to the plaintiff, there is any merit to the underlying constitutional claim. *Saucier v. Katz,* 533 U.S. 194, 200 (2001); *Norfleet v. Webster,* 439 F.3d 392, 395 (7th Cir. 2006). As the foregoing discussion shows, in this case "[w]e need not consider qualified immunity past the determination of whether the facts taken in the light most favorable to [Dale] show a constitutional violation." *Id.* at 396 (citing *Riccardo v. Rausch,* 375 F.3d 521, 526 (7th Cir. 2004)).

11.   If the non-moving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment is properly granted to the moving parties. *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir. 1996). That is the case here, notwithstanding that "[f]ederal courts must take cognizance of the valid constitutional claims of prison inmates." *Babcock v. White,* 102 F.3d 267, 275 (7th Cir. 1996) (quoting *Turner v. Safley,* 482 U.S. 78, 84 (1987)). "After one party has filed a motion for summary judgment, `the burden shifts to the non-moving party to show through specific evidence that a triable issue of fact remains on issues [on] which the nonmovant bears the burden of proof at trial.'" *Pharma Bio, Inc. v. TNT Holland Motor Express, Inc.,* 102 F.3d 914, 916 (7th Cir. 1996) (quoting *Walker v. Shansky,* 28 F.3d 666, 670-71 (7th Cir. 1994)). Dale has not identified a genuine issue of material fact as to his claims against the defendants. This case is not about Dale's request for a transfer or which defendant, if any, had any authority to initiate or participate in a transfer decision. This case is about whether the defendants knew that Dale "was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though [they] could have easily done so." *Board v. Farnham,* 394 F.3d 469, 478 (7th Cir. 2005) (quotation marks, brackets, and citation omitted). The evidence shows that they did not, and no reasonable jury could conclude otherwise. The defendants' motion for summary judgment is therefore **granted**. All pending motions are **denied as moot**.

Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 05/11/2006

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana